**District Court of the United States**
**District of Maine**

-------------------------------------------

John Barth,
        Plaintiff

  vs.

Town of Waterboro,
Gary Lamb, Jonathan Brogan,
        Defendants

-------------------------------------------

Case No. 1:21-CV-_____

**COMPLAINT**

**CONTENTS**

Statement Of Claims ........................................................................................... 5
Authorities........................................................................................................... 9
Fact....................................................................................................................... 14
  Summary of Fact.............................................................................................14
  Timeline of Construction and Communications............................................16
  Related Criminal Activity in Springvale and Waterboro 1998-2004 ...........18
  Permitting and Construction Under the Original Permits 2005-2009 ...........20
  Obstruction of Building Permit to Complete the Original Structure 2014-2018........................22
  Damage to the Original Structure by Delays in Permitting .........................27
  Crime at Springvale School Resumes After Waterboro ZBA Meeting.......27
  Organized Crime of the Defendants Continues Throughout State Proceedings.........................28
  Crimes of Defendant Brogan Throughout the State Proceedings.................30
  State Courts Evaded State Law with Perjuries as to the Facts and the Law...............................33
Conclusion .......................................................................................................... 34
Demand for Relief............................................................................................... 36
  Estimate of Just Compensation For Taking Of Private Property .................36

**NOTICE:** This case cannot be assigned to judge Woodcock without violation of the Code of

Judicial Conduct and federal law, because his relative is employed by defendants' lawyers, and

he has rendered an unconstitutional decision against the plaintiff, necessitating his later recusal.

**Summary**

This is an action to vindicate state constitutional rights and obtain compensation for damages to Plaintiff caused by the defendants, by granting a building permit, followed after construction of a foundation, by delays, demands, and finally denial of renewal, causing the taking of private property in violation of rights of the Plaintiff guaranteed by the Constitutions of Maine and the United States, and caused by their acts of collusion to abuse public office.

This action demands compensation of damages caused by violation of rights protected by the Constitution of the United States, by the defendant town (Count I), and for those and other violations by defendant Lamb (Count II).

The Plaintiff has been injured financially in the use and value of his property, and the loss of extensive expense and effort in its development, by the acts of defendants. The defendants have shown disregard of constitutional rights, and the intent of theft of the property of Plaintiff. Having purchased an island, and having spent thousands of hours of work and substantial investments in preparation and construction of a home there, expecting to gain substantial real estate value that he cannot now realize, the Plaintiff demands substantial compensation.

This action raises issues of common law affected by case law. The primary issues are (1) entrapment or fraud by negligent or malicious approval of a construction plan, with specific approval of details at issue, followed by refusal to renew permits without re-engineering and rebuilding; (2) vested rights and equitable estoppel from denying permits after construction of the foundation, without compensation to replace the foundation (argued in Memorandum of Law 1); (3) violations of Civil Rights law in the taking of property value without compensation or public exigency (Memorandum of Law 2); and (4) conspiracy in taking property value and obstruction of permits, related to serious crimes by related persons in Springvale (Memorandum of Law 3).

Having approved the construction without requiring engineering evaluation, including communication that established a "special relationship" approving the specific details at issue, and thereby having assured the Plaintiff that the building codes were sufficient to ensure its compliance and safety, the defendant town effectively deceived the Plaintiff, and is obliged to compensate the Plaintiff for rebuilding the foundation that it later claims to be at variance with building codes and unsafe, and for direct and consequent damages caused by its obstruction.

2

The construction of the foundation having been completed in good faith reliance upon the original permit, the right of the Plaintiff to complete the construction planned had vested, and the defendant town is equitably estopped from interference or denial of renewal of permits.

The defendant town having taken the value of reconstruction of the foundation, the value of use of the completed home for the period of delays, and the value of increased costs of completion due to the reduced ability of the Plaintiff at age 68 to build foundations and carry heavy materials to the island location, the town must make compensation of the increased costs.

The defendants have willfully prevented the Plaintiff by years of delays from completing the home with his own labor, as strength declines with age, and he does not have resources for an otherwise costly home construction, and so the defendant has willfully prevented the Plaintiff from realizing the substantial value of a new home on a private island, and must therefore compensate the entire construction cost or difference of value of the completed project, as well as the deprivation of use of the island home until it would have been sold, and costs of prosecution.

The facts of collusion of defendant Lamb with ATV gangs that for years attacked the charity school of the Plaintiff in Springvale and the subject property, and his acts as manager of defendant town in causing these wrongs, are stated here, and argued in Memorandum of Law 3.

The facts of collusion of Jon Brogan of Norman, Hansen, Detroy of Portland, who acted as attorney of defendants Waterboro and Lamb in the prior state action, and therein engaged exclusively in perjuries as to the facts, the law, and the course of proceedings, and exerted unlawful concealed influence upon the state judge, are stated herein. Brogan and his company are subject to racketeering action due to their collusion to damage other Plaintiff property.

Because the defendants intend to prevent or burden construction of the home or burden its use, the defendants must compensate the full value of the completed home on its private island, less the remaining cost of construction as planned by the Plaintiff.

**PARTIES**

1. Plaintiff John Barth is the developer of an island in Lake Arrowhead, town of Waterboro, York county, state of Maine (assessor map 13 lot 84 exhibits 1 and 30), hereinafter "subject property". The Plaintiff donated the island about 11/3/2017 to Lenox School Inc., a Massachusetts Ch. 180 nonprofit corporation and IRS 501(c)(3) nonprofit corporation of which he is the president, sole remaining member of the Board of Trustees, and resident agent. The Plaintiff retains a reversionary right, right to the use of the property in retirement, and an interest in pension benefits from the School that cannot be met if the property value is damaged, and is therefore exposed to direct losses by damage to the property value. The Plaintiff having a continuing interest in the value of the subject property, and Lenox School as present owner, are referred to hereinafter as the "owners." Plaintiff is represented Pro Se.

2. Defendant Town of Waterboro is a municipality of Maine in York county.

3. Defendant Gary Lamb of 701 Hanson Ridge Rd, Maine, formerly of 7 Joy St in Springvale, is and since 2014 has been town manager of defendant town of Waterboro, with a history of collusion in violent attacks upon the Plaintiff, on the campus of Lenox School in Springvale.

4. Defendant Jonathan or Jon Brogan of Norman, Hansen, etc. of Two Canal Plaza in Portland, Maine acted as attorney of defendants Waterboro and Lamb in the prior state action to recover compensation for damages, and therein engaged exclusively in perjuries as to the facts, the law, and the course of proceedings, and exerted unlawful concealed influence upon the state judge.

4

**Statement Of Claims**

## COUNT I

Defendant town of Waterboro, having denied permission to complete construction on the subject property after granting permit for the same, has violated rights of the Plaintiff guaranteed by the Constitution of the United States, as well as the common law vested right of the Plaintiff to complete construction under the permit; and having required rebuilding of existing construction under its building code ordinance claiming safety concerns, has made the permit and its denial acts of abuse of office; and having caused damage to existing construction by years of delay and having required rebuilding thereof, and having denied realization of the developed property value, has willfully taken substantial private property without compensation.

The said acts of defendant were made in *official capacity*, with *intent to deprive* the Plaintiff of the said property and the free exercise of the said rights, with full *knowledge* of the injury done, and by *choice among alternatives*, the criteria of civil rights violations.

These acts were done *without permission* of the Plaintiff, and have *caused injury* to the Plaintiff in liberty and quality of life, property use and value, costs of planning and construction, consequent damages, and costs of prosecution, for which Plaintiff demands full compensation.

Defendant town has thereby violated the rights of the Plaintiff guaranteed by the Constitution of the United States, Art. I § 9 (*ex post facto law*), and by Amendments V and XIV, in violation of the Civil Rights Act 42 USC §§ 1981-1986, including acts *under color of state law* to deny the *equal protection of law*, and interference with interstate commerce conducted by the Plaintiff, all federal issues providing jurisdiction of the United States due to the exhaustion of state remedies.

For reference to state process, these offenses further constitute deprivations of rights guaranteed by the Constitution of the State of Maine, Article I sections 1, 11, 19, and 21, and are violations of the statutes of Maine listed hereunder.

The facts, exhibits, and argument whereof are listed hereunder.

Fact and Exhibits:    All
Memoranda of Law 1 and 2: All sections
Memorandum of Law 3: section *Damages*
Violations of Law:    The United States Constitution, Art. I § 9; Amendments V, XIV;
                            Civil Rights Act 42 USC §§ 1981-1986;
                            The Constitution of the State of Maine, Article I, §§ 1, 11, 19, and 21;
                            Maine Declaration of Rights, Art. 1, and Art. 106 of Amendments
                            MRSA 5 Ch. 337    (Maine Human Rights Act)
                            MRSA 5 Ch 337-B    (Civil Rights Act)
                            MRSA 17-A § 903    (abuse of public trust or office)
                            MRSA 30-A § 2632  (town manager qualifications) § 2636 duties
                            MRSA 30-A § 3001  (municipal ordinances may not counteract state law)
                            MRSA 30-A § 3007(6) (town may not change permit by later ordinance)

## COUNT II

Defendant Lamb, acting as manager of defendant town, by collusion, abuse of public office, and libel to town officials to obstruct construction upon the subject property, has violated rights of the Plaintiff guaranteed by the Constitution of the United States, as well as the vested right of the Plaintiff to complete construction under a building permit; and having caused damage to existing construction by years of delay and having required rebuilding thereof, and having denied realization of the developed property value, has willfully injured the Plaintiff and caused the defendant town to take private property of the Plaintiff without compensation.

The defendant Lamb may have admitted Class A felony crime by sending his sons together to attack the Plaintiff, in violation of MRSA 17-A §§ 151 and 152-A, and other crimes.

The said acts of defendant were made in *official capacity*, with *intent to deprive* the Plaintiff of the said property and the free exercise of the said rights, with full *knowledge* of the injury done, and by *choice among alternatives*, the criteria of civil rights violations.

These acts were done *without permission* of the Plaintiff, and have *caused injury* to the Plaintiff in liberty and quality of life, property use and value, costs of planning and construction, consequent damages, and costs of prosecution, for which Plaintiff demands full compensation.

Defendant Lamb has thereby violated the rights of the Plaintiff guaranteed by the Constitution of the United States, Art. I § 9 (*ex post facto law*), and by Amendments V and XIV, in violation of the Civil Rights Act 42 USC §§ 1981-1986, including acts *under color of state law* to deny the *equal protection of law*, and interference with interstate commerce conducted by the Plaintiff, all federal issues providing jurisdiction of the United States due to the exhaustion of state remedies. The facts, exhibits, and argument whereof are listed hereunder.

For reference to state process, these offenses further constitute deprivations of rights guaranteed by the Constitution of the State of Maine, Article I sections 1, 11, 19, and 21, and are violations of the statutes of Maine listed hereunder.

Fact and Exhibits:    All
Memorandum of Law 1 section *Criminal Conspiracy*
Memorandum of Law 2 section *Violations of Civil Rights Law*
Memorandum of Law 3 sections *Libel, Abuse of Public Office, Removal of Town Manager*
Violations of Law:    The United States Constitution, Art. I § 9; Amendments V, XIV;
    Civil Rights Act 42 USC §§ 1981-1986;
    The Constitution of the State of Maine, Article I, §§ 1, 11, 19, and 21;
    Maine Declaration of Rights, Art. 1, and Art. 106 of Amendments
    MRSA 5 Ch. 337    (Maine Human Rights Act)
    MRSA 5 Ch 337-B    (Civil Rights Act)
    MRSA 30-A § 2632    (town manager qualifications) § 2636 duties
    MRSA 30-A § 3007(6) (town may not change permit by later ordinance)
Criminal Violations:    MRSA 17-A § 151    (criminal conspiracy)
    MRSA 17-A § 152-A (attempted murder)
    MRSA 17-A § 506-A (harassment by noise and lesser criminal mischief)
    MRSA 17-A § 805    (aggravated criminal mischief over $2000)
    MRSA 17-A § 903    (abuse of public trust or office)

## COUNT III

Defendant Brogan, acting as attorney for defendants Waterboro and Lamb, by collusion with them, and by perjury as to the facts, the law, and the course of proceedings, has violated rights of the Plaintiff guaranteed by the Constitution of the United States, as well as the vested right of the Plaintiff to complete construction under a building permit; and having caused damage to existing construction by years of delay and having required rebuilding thereof, and having denied realization of the developed property value, has willfully injured the Plaintiff and caused the defendant town to take private property of the Plaintiff without compensation.

The said acts of defendant were made with *intent to deprive* the Plaintiff of the said property and the free exercise of the said rights, with full *knowledge* of the injury done, and by *choice among alternatives*, the criteria of civil rights violations.

These acts were done *without permission* of the Plaintiff, and have *caused injury* to the Plaintiff in liberty and quality of life, property use and value, costs of planning and construction, consequent damages, and costs of prosecution, for which Plaintiff demands full compensation.

Defendant Brogan has thereby violated the rights of the Plaintiff guaranteed by the Constitution of the United States, Art. I § 9 (*ex post facto law*), and by Amendments V and XIV, in violation of the Civil Rights Act 42 USC §§ 1981-1986, including acts *under color of state law* to deny the *equal protection of law*, and interference with interstate commerce conducted by the Plaintiff, all federal issues providing jurisdiction of the United States due to the exhaustion of state remedies. The facts, exhibits, and argument whereof are listed hereunder.

For reference to state process, these offenses further constitute deprivations of rights guaranteed by the Constitution of the State of Maine, Article I sections 1, 11, 19, and 21, and are violations of the statutes of Maine listed hereunder.

Fact and Exhibits:     All
Memorandum of Law 1 section *Criminal Conspiracy*
Memorandum of Law 2 section *Violations of Civil Rights Law*
Memorandum of Law 5 sections ****
Violations of Law:     The United States Constitution, Art. I § 9; Amendments V, XIV;
                         Civil Rights Act 42 USC §§ 1981-1986;
                         The Constitution of the State of Maine, Article I, §§ 1, 11, 19, and 21;
                         Maine Declaration of Rights, Art. 1, and Art. 106 of Amendments
                         MRSA 5 Ch. 337     (Maine Human Rights Act)
                         MRSA 5 Ch 337-B     (Civil Rights Act)
                         MRSA 30-A § 3007(6) (town may not change permit by later ordinance)

**Jurisdiction**

Jurisdiction is based upon federal issues. This action is brought under the United States Civil Rights Act (42 USC §§1983 to 1986), for violation by the defendants of the rights of the Plaintiff guaranteed by the Constitution of the United States, including his right against the taking of his private property without just compensation (Amendment V); his right against deprivation of property without due process of law (Amendment XIV Section 1), his right to the equal protection of the laws (Amendment XIV Section 1); and his corresponding rights under the Constitution and Laws of Maine. The cited statutes of Maine are unconstitutional as applied in state court to deny the Plaintiff relief from these violations of rights.

This district court has original jurisdiction under 28 USC §1331 (federal issue) of the claims herein of violations of rights guaranteed by the United States Constitution, and of claims of interference with interstate commerce.

This district court has original jurisdiction under 28 USC §1343(1 and 2) (conspiracy) of the claims herein of deprivations of civil rights by acts of conspiracy in violation of 42 USC §1985 (Civil Rights Act), or failure to prevent such deprivations. This district court has original jurisdiction under 28 USC §1343(3) (color of state law) of all claims herein of deprivations of civil rights under color of state law.

With the denial of corresponding claims under state law by the courts of Maine, state remedies are now exhausted and these federal claims are ripe. See Memorandum of Law, *Law of the Takings Clause*, United States Law.

**Authorities**

**Cases** (referenced and listed in Memoranda of Law)                    **Page References**

(M1-3 is Memorandum of Law 1-3)

**Civil Rights Act 42 USC § 1983-1985**
  **Purposes**
1. *Monroe v. Pape* 365 US 173 (1961)                                        M2 7,9, M3 13
2. *Mitchum v. Foster*, 407 U.S. 225, 242 (1972)                             M2 7
  **Liability**
10. *Parratt v. Taylor*, 451 U.S. 527 (1981)                                 M2 7
11. *Monell v. Dept of Social Services of NY*, 436 U.S. 658, 690-691 (1978)  M2 7
12. *City of Canton v. Harris*, 489 U.S. 378 (1989);                         M2 7
        *Gold v. City of Miami*, 1998 WL 54803 (11th Cir. 1998);
        *Sewell v. Lake Hamilton*, 117 F.3d 488 (11th. Cir. 1997)
13. *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986);                    M2 7
        *Bryan County v. Brown*, 520 U.S. 397 (1997)
14. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)             M2 7
15. *Patsy v. Florida Board of Regents*, 457 U.S. 496, 501 (1982)          M2 7
16. *Zinermon v. Burch*, 494 U.S. 113, 124, 132 (concurrent state remedies not a bar)   M2 7
17. *Owen v. City of Independence*, 445 U.S. 622 (1980) at 635-38          M2 8
  **Capacities of Defendants and Remedies Against Defendants**
20. *Hafer v. Melo*, 502 U.S. 25, 31 (1991); Kentucky v. Graham, 473 U.S. 159 (1985)   M2 7
21. *City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985)                 M2 7
22. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)                         M2 7
23. *Will v. Michigan Dept. of State Police*, 491 U.S. 58 (1989)           M2 7
24. *Ex Parte Young*, 209 U.S. 123 (1908)                                   M2 7
25. *Carey v. Piphus*, 435 U.S. 247, 266-267 (1978) (no limit on damages)   M2 18, M3 15
26. *Farrar v. Hobby*, 506 U.S. 103, 112 (1992) (no limit on damages)      M2 18
27. *City of Newport v. Fact Concerts*, 453 U.S. 247 (1981) (punitive damages)   M2 19
28. *Smith v. Wade*, 461 U.S. 30 (1983) (punitive damages)                  M2 19
  **Immunity**
54. *South v. Maryland*, 59 U.S. 396 (1856)                                 M2 11, M3 5
55. *Brown v. Western Railway of Alabama,* 338 U.S. 294 (1949) at 298-99    M2 12
  **Definition of Constructive Taking of Property**
100. *Palazzolo v. Rhode Island*, 99-2047 (2001)                            M2 13, M3 12
102. *Lucas v. SC Coastal Council*, 505 US 1003,112 S.Ct. 2886, 120 LEd2d 798)   M2 14,15
103. *Nollan v. California Coastal Comm'n*, 483 U. S. 825 (1987)           M2 14
104. *Penn Central Transportation Co. v. New York City* 438 U.S. 104 (1978)   M2 14,15, M3 13
106. *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922)                 M2 14,15
109. *Gomillion v. Lightfoot* 364 U.S. 339 (1960)                          M2 16
111. *U.S. v. 564.54 Acres*, 441 U.S. 506, 511 (1979)                      M2 7
  **Vested Rights and Taking of Property**
200. *Kalkman v. City of the Village of Douglas* (MI, unpublished judgment)   M1 7, M3 14
201. *Koontz V. St. Johns River WM District*, 77 So. 3d 1220 (Fla)        M3 11
202. *Crosby v. Town of Belgrade*, 562 A.2d 1228 (1989)                    M1 9

203. *Sun Cruz Casinos v. City of Hollywood*, 844 So.2d 681 (Fla 4th DCA 2003)    M1 7,13
204. *Cuccia v. Jefferson*, No. 07-CA-152, La CA, 5th Ct  (2007)    M1 5,13
205. *Dunn v. Jefferson Parish, La*. 256 So.2d 664 (1972)    M2 5,13
206. *Sizemore v Town of Chesapeake*, 2015 WL 7573409 (MD 11/25/2015)    M1 5
207. *Thomas v. Zoning Board of Appeals of Bangor*, 381 A.2d 643, 647-8 (1978)    M1 5
208. *Steven Sahl et al v. Town of York et al* Me Supreme Court 2000 ME 180    M1 5,7
209. *Littlefield v. Inhabitants of Lyman*, 447 A.2d 1231 (Maine 1982)    M1 5
210. *Pardee Constr. Co v. Calif. Coastal Commission*, 95 Cal.App.3d 471 (1979)    M1 6
211. *Castro v. Miami-Dade County*, No. 3D06-1321, FL Ct of App, 3d Distr(2007)    M1 8
212. *Peterson v. Town of Rangeley*, 1998 ME 192, 715 A.2d 930.    M1 7
213. *Dept of Environmental Resources v. Flynn*, 344 A.2d 720 (PA Cmwlth. 1975)    M1 9
214. *Shackford & Gooch, Inc. v. Kennebunk*, 486 A. 2d 102 Supr Jud Ct 1984    M1 7
   **Review of Municipal Decisions**
215. *Aydelott v. City of Portland*, 210 ME 25, par 10, 990 A.2D 1024    M1 4
216. *Herrick v. Town of Mechanic Falls*, 673 A. 2d 1348 - Me: Supr Jud Ct 1996    M1 4
217. *Boivin v. Town of Sanford*, 588 A.2d 1197, 1199 (Me.1991)    M1 4
218. *Nugent v. Town of Camden*, 1998 Me 92, par 7, 710 A.2d 45    M1 4
219. *Williams v. Thurston County*, 997 P.2d 377 (2000)    M2 11
   **Negligence, Breach of Trust, and Entrapment**
230. *Rogers v. Toppenish,* 23 Wash. App. at 560, 596 P.2d (1979) at 1099    M1 10
231. *Campbell v. Bellevue,* 85 Wash. 2d at 9-10, 530 P.2d at 239    M1 10
232. *Taylor v. Stevens County,* 111 Wash. 2d at 166, 759 P.2d at 451    M1 10
   **Libel**
235. *Cohen v. Bowdoin*, 288 A. 2d 106, Me: Supr Jud. Ct 1972    M3 3
236. *Tillson v. Robbins*, 68 Me. 295 (1878);    M3 3
      *Brown v. Gannett Publ. Co*., 147 Me. 3, 82 A.2d 797 (1951); and
      *Powers v. Durgin-Snow Pub. Co., Inc*., 154 Me. 108, 144 A.2d 294 (1958)
237. *Fahy v. Melrose Free Press, Inc*., 298 Mass. 267, 10 N.E.2d 187 (1937);    M3 3
      *Meyerson v. Hurlbut*, 98 F.2d 232, 305 US 610, 59 S.Ct. 69, 83 L.Ed. 388
238. *Brown v. Guy Gannett Publishing Co.*, 147 Me. 3, 5, 82 A.2d 797, 798    M3 3
239. *State v. Norton*, 89 Me. 290, 294, 36 A. 394, 395.
240. *Palmerlee v. Nottage*, 119 Minn. 351, 353, 138 NW 312, 42 L.R.A., N.S. 870    M3 3
241. *Cross v. Guy Gannett Publ. Co.*, 121 A. 2d 355 Me Supr Jud Ct 1956,    M3 3
      quoting *Muchnick v. Post Publ. Co.*, 332 Mass. 304, 125 N.E.2d 137, 138
   **Abuse of Public Office and Breach of Public Duty**
243. *Maine Real Estate Comm'n v. Jones*, 670 A.2d 1385, 1387 (Me.1996)    M3 5
244. *Muchnick v. Post Publishing Co*., 332 Mass. 304, 125 N.E.2d 137, 138    M3 5
245. *Rogers v. Brown et al., Selectmen of Brunswick*, 135 Me. 117, 120, 190 A. 632    M3 5
246. *Memphis Cmty. Sch. Dist. v. Stachura*, 106 S. Ct. 2537, 91 L. Ed. 2d 249    M3 5,15

**Other Authorities**
300. *Constitutional Remedies: A Ref. Guide to the US Constitution*, Wells, Eaton    M3 11
301. *The Measure of Just Compensation*, K. Wyman, NYU    M3 11
302. *Vested Rights And Zoning*, K. Crocker, BC Law Review, v.43-4
303. *David G. Heeter, Zoning Estoppel*, 1971 Urb. L. Ann. 63, 66 (1971);
304. *Manual for Local Planning Boards: A Legal Perspective*, Me Munic. Assoc.    M1 5

305. *The Public Duty Doctrine*, Gail S. Kelley, P.E., Esq., Structure, 2014          M1 5
306. *Liability and the Public Duty Doctrine,* J. McMillan, 32 Vill. L. Rev. 505, 529.          M2 11
307. *Black's Law Dictionary*, 5th Ed.          M1 4

**Constitutional Provisions, Statutes, and Ordinances**

### The Constitution of the United States
**Article I § 9** (*ex post facto law*),
**Amendment V:**
> "No person shall be … deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

**Amendment XIV Section 1:**
> "…nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

### The Constitution of Maine, Article I:
§1. All people… have… rights, among which are those of… protecting property...
§11. The Legislature shall pass no… ex post facto law…
§21. Private property shall not be taken for public uses without just compensation; nor unless the public exigencies require it.

### Statutes of the United States
**42 USC §§ 1983 to 1988 (Civil Rights Act)**
§ 1983 "Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, Suit in equity, or other proper proceeding for redress..."

§ 1985 "If two or more persons in any State or Territory conspire…for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; ... if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages..."

§ 1986 "Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in the preceding section [42 USCS § 1985], are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses to do so, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused

by such wrongful act, which such person by reasonable diligence could have prevented;"

**Statutes of Maine**

Maine Declaration of Rights, Art. 1, and Art. 106 of Amendments
MRSA 5 Ch. 337        (Maine Human Rights Act)
MRSA 5 Ch 337-B       (Civil Rights Act) (§4682 guarantees federal rights)
MRSA 17-A § 151        (criminal conspiracy)
MRSA 17-A § 152-A (attempted murder)
MRSA 17-A § 506-A (harassment by noise and lesser criminal mischief)
MRSA 17-A § 805        (aggravated criminal mischief over $2000)
MRSA 17-A § 903        (abuse of public trust or office)
MRSA 30-A § 2632   (town mgr. qualifications) § 2633 removal § 2636 duties
MRSA 30-A § 2691   (municipal officials, board of appeals)
MRSA 30-A § 3001   (municipal ordinances may not counteract state law)
MRSA 30-A § 3007(6) (municipality may not change permit by later ordinance)
MRSA 30-A § 4482(1) (municipal land use appeal in Superior Court)

**Ordinances of Town of Waterboro**

Article 2 § 2.03        (building permits) and § 2.05 (codes official duties)
Article 10        (zoning board of appeals)

**Other Authorities**

"It is the unjust judge, that is the capital remover of landmarks, when he defineth amiss, of lands and property... It is a strange thing to see, that the boldness of advocates should prevail with judges... Nothing doth more hurt in a state, than that cunning men pass for wise...  Persons that are full of sinister tricks and shifts, whereby they pervert the plain and direct courses of courts, and bring justice into oblique lines and labyrinths."
                - Francis Bacon, *Essays* 1625

"Destroy his fib, or sophistry – in vain! The creature's at his dirty work again."
                - Alexander Pope, *Epistle to Dr. Arbuthnot,* 1734

"Here let those reign, whom pensions can incite, to vote a patriot black, a courtier white, Explain their country's dear-bought rights away, and plead for pirates in the face of day."
                -Samuel Johnson, *London,* 1738

"Villainy, when detected, never gives up, but boldly adds impudence to imposture."
                - Oliver Goldsmith, *A City Night-Piece,* 1759

"When bad men combine, the good must associate; else they will fall one by one, an unpitied sacrifice in a contemptible struggle."
                - Edmund Burke, *Thoughts on the Cause of the Present Discontents*, 1770

"The functionaries of every government have propensity to command at will the liberty and property of their constituents."
- Thomas Jefferson, *letter to Col. Yancey*

"The… United States has been… a government of laws, and… will cease to deserve this… if the laws furnish no remedy for the violation of a vested legal right."
- John Marshall, *Marbury v. Madison,* 1803

"Power, lodged as it must be in human hands, will ever be liable to abuse."
- James Madison, *speech at the Virginia constitutional convention*, 1829

"Whatever government is not a government of laws, is a despotism…"
- Daniel Webster, *at a reception in Maine*, 1835

"A revolt of the judiciary is more dangerous to a government than any other, even a military revolt."
- Alexis de Toqueville, *Democracy in America,* 1835

"Power tends to corrupt, and absolute power corrupts absolutely…
There is no worse heresy than that the office sanctifies the holder of it."
- Lord Acton, *letter to Creighton*, 1887

"The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding. … If the government becomes a law-breaker, it breeds contempt for the law."
- Louis Brandeis, *Olmstead v. U.S.,* 1928

"The rights of every man are diminished when the rights of one man are threatened."
- John F. Kennedy, *report on civil rights,* 6/11/1963

**Fact**

 **Summary of Fact**

The Plaintiff lives about 15 miles from the subject property, in the village of Springvale in Sanford, where in 1992-2004 he sought to establish a nonsectarian college preparatory school, that would sponsor about 2000 orphans in developing nations, using the upper campus of the former Nasson College there, where he undertook major repairs and renovations. The Plaintiff was subject to many years of violent opposition by fundamentalist and demagogic factions in Springvale, including over 1500 rounds of gunfire at the school, three armed gang attacks, several murder attempts, three arson attempts, destruction of three school vehicles and ransacking of building interiors, dozens of break-ins with theft and vandalism, constant extreme slanders throughout the town, false reports to town, state, and federal officials, and years of extreme noise harassment by racing unmuffled ATVs on the adjacent nature trail, to prevent the opening and operation of the school. The town of Sanford itself became involved in these attacks. After eight years of prosecution of the town of Sanford, the school could not be opened due to these criminal acts, and the campus remains empty. Defendant Lamb, a local church activist, has admitted involvement of his sons in one or more of these attacks upon the school. These actions are recorded in the Plaintiff's 2015 novel *The National Memorial*. About 4000 orphans have lost their childhoods and opportunities in life as the direct result of these organized criminal activities of the town of Sanford, including those of the misnamed defendant Lamb.

The Plaintiff purchased in 2000 the subject property, an island of seven acres in Lake Arrowhead in the town of Waterboro, and began planning and permitting to construct a home there for his use in retirement. Two permits are required, the usual municipal building permit, and a conservation permit of the Saco River Corridor Commission (SRCC). In 2004 Plaintiff obtained permission of the SRCC for a modified design, and in 2005 he obtained a building permit from the defendant town of Waterboro, and commenced construction energetically.

The town codes official approved the plans with slight changes in accordance with codes then in effect, without requiring an engineering design. The town did not own a boat to inspect the island site, but the codes official declined the offer of the Plaintiff to use his boat, and instructed the Plaintiff to send design change drawings to her for approval, and to send photos of all work to her in lieu of inspections. When the permit "expired" in 2007, the same codes official

14

informed him that she would renew the permit herself. Work was completed to the present state in 2008-9, and then halted due to the recession. The Plaintiff, a software engineer, was out of work for several years due to medical limitations on commuting imposed in 2010.

In February 2014 defendant Lamb of Springvale became the town manager of defendant town, and in December 2014 the present codes official Glen Charette was hired, along with his assistant Tamara Bellman, both from the village of Springvale 15 miles away. In 2014 the Plaintiff sought to renew the building permit and was met with numerous demands and denials by defendant town officials. Losing four construction seasons, the Plaintiff complied with costly and time-consuming demands for a new septic system design and a new survey showing the structure as built. The permit renewal was then denied nonetheless, with the demand for a complete engineering redesign and replacement of the foundation, in that freezing cracks had developed during those last two years, in the foundation piers as constructed, due to these delays.

The defendant town refused to find an acceptable reinforcement of the piers, or to pay for its errors in permitting, or its unlawful demand to apply ex post facto standards to a structure built in accordance with the prior permit. Upon appeal to the ZBA of the town, the Plaintiff was forced to drive 50 hours through storms roundtrip from Florida to attend the 1/5/2018 meeting, which the ZBA cancelled upon his arrival, fully aware of the problems caused. The ZBA then denied the variance on 5/21/2018 on the absurd pretext of having no authority after all. The ZBA was plainly motivated by envy and prejudice to destroy the property value to the Plaintiff.

During state process to enforce state constitutional rights and state law, the defendants resumed their violent organized crime against the charity school, documented in nine affidavits with exhibits, including the destruction of a car, two boats, two trailers, and damage by axes and clubs to the exterior of two buildings there. All of this terrorism was completely ignored by the state court, the same court that condoned the prior crimes against the school. The defendants' responses consisted entirely of lies, immaterial citations, and scam proposals to the judge.

State process resulted only in the absurd decision of a corrupt local judge, that a required administrative review of the ZBA decision magically precluded any civil process under state law, and the state court of last resort refused to review that unsupported and unsupportable decision.

**Timeline of Construction and Communications**

| | |
|---|---|
| 10/4/2000 | Land purchased by Plaintiff |
| 2004 | SRCC permit 15-432 (renewed through 2018) |
| 2/08/05 | Letter to CEO Berry on plans, reply "Your drawings should be sufficient." |
| 7/06/05 | Email to CEO showing columns and steel frame. Verbally approved. |
| 9/20/05 | Building permit GP-15 granted. Emails to CEO on plumbing permit issues. |
| 2005 | Assembling of tools, boats; building docks, amphibious trailer, and modular shed. |
| 2005 | CEO Berry tells Plaintiff that town has no boat, and despite his offer of boat use, he must send photos in lieu of inspections, and plan changes for verbal approval. |
| 2005-2006 | Construction of shed, clearing trees on site, staking, construction of lower piers |
| 6/09/06 | Emails to CEO "I plan to begin the foundation work ASAP this month." |
| 1/2007 | CEO Berry letter that new permit needed (letters crossed in the mail) CEO verbally assures Pl that she will renew the permit herself. |
| 1/30/07 | Sent letter to CEO Berry with drawing of pier changes; verbal approval. "A foundation… should be ready for inspection by next Fall." |
| 2008 | Letter to CEO Berry reporting progress with photos in lieu of inspection. |
| 2008-2009 | Construction of upper piers; installation of steel beams; work ended. |
| est 9/16/09 | (informal permit renewal expired under present rules; Plaintiff unaware of this) |
| est 6/30/11 | CEO Ms. Berry reassigned from CEO (apparently no CEO for months) |
| 2/4/2012 | Letter to CEO Berry with more drawings and photos. |
| 4/13/12 | Letter from CEO Mr. Mitchell notes permit expired "contact immediately" |
| c. 4/17/12 | Met with CEO Mitchell, reported progress and gave updated drawings. He had no objection to the changes and stated that he was still getting settled in new position, so work should proceed temporarily. |
| 8/7/12 | Letter to CEO reporting that minor welding has completed the steel installation. |
| 8/22/12 | Letter from CEO noting permit expired, enclosing new permit application. |
| 2013-2014 | (no permit sought due to recession losses) |
| 2/2014 | Defendant Lamb becomes manager of defendant town. |
| 12/2014 | Glen Charette becomes codes official of defendant town, with assistant Bellman |
| 2014 | Plaintiff inquiries on building permit renewal meet with unreasonable opposition. |
| early 2016 | Plaintiff formally applies to renew building permit |
| 7/14/16 | Letter from CEO demanding new survey, new septic design, SRCC approval |
| 8/16/16 | Building permit application. Full size drawings in print and digital form. |
| 8/2016 | Submitted new septic system design. |
| 8/24/16 | Letter from CEO requiring new engineering approval, and only one structure despite earlier permit and SRCC approvals. |
| 9/26/16 | Submitted new survey as built, showing small beam extent over boundary |
| late 2016 | Cracks found in foundation piers due to weathering during delay periods. |
| 3/27/17 | Letter to CEO noting new engineering for existing work is cost prohibitive; with suggested improvements: "I will be glad to do anything that makes sense anyway." |
| 3/31/17 | Letter from CEO, refusing cooperation, further claiming zoning violations. |
| 5/24/17 | Letter to CEO "the structure built so far was permitted, and if there was a better way, I should have been told before it was built…the heavy pier structure so far was… just as |

much work to do differently. ... So we should cooperate in finding the easiest way to make the existing structure acceptable. An arbitrator would suggest... that the town pay for the mistake."
2018            Defendant town denies permit, refers to ZBA, which refuses to review.

Footnote Conclusions on the Timeline:

1. The structure as built was completed in 2009 which was within the renewal period of the original permit, renewed informally by the CEO.
2. The structure as built was completed in accordance with the original design and design change drawings accepted formally and informally during the permit period.
3. The lack of inspections of the structure as built was accepted by the CEO because there was no town boat to permit inspections, and photos of the work in progress were accepted.
4. So the structure as built was fully approved by the town under the original permit.
5. The new SRCC permit was obtained in 2016 without design changes.
6. The subsequent requirements for a survey as built, and a new septic system design, were met promptly. The location variations as built are "de minimus" (6" to 18").
7. The subsequent demands for engineering changes to the structure already built, and for greater shoreline setbacks that would be prohibitive, are attempts to block construction despite prior approval, which are unlawful attempts to seize private property.

**Related Criminal Activity in Springvale and Waterboro 1998-2004**

1. The subject property was conveyed to Plaintiff by deed of 10/4/2000 (Book 10252 Page 154 Exhibit 30). Plaintiff proceeded rightfully with his plan to build a home there for his own use.

2. The Plaintiff lives about 15 miles from Waterboro in the village of Springvale in Sanford, where in 1992-2004 he sought to establish a nonsectarian college preparatory school, that would sponsor about 2000 orphans in developing nations, using the upper campus of the former Nasson College ("Springvale property"), where he undertook major repairs and renovations.

3. Like many villages, Springvale in Sanford has throughout its history been controlled by tribalistic factions led by low-end demagogues. The members of each tribe of church, national origin, or party are dependent upon their tribe for employment, business, and social interaction, and are forced to fear ostracism by their tribe, and to seek its social and economic rewards. The tyrants of each tribe must have a declared enemy so as to pose as protectors of the tribe, and its dependents cannot disregard its demands, fail in its praise, nor fail to make physical or verbal assaults against the declared tribal enemy, or they will lose job, business, and friends. Sanford may be the last town in the nation to persecute a witch in 1840, and harbored a hatred of mill owners and managers in the 19th century, transferred to Nasson College and its successors in the 20th century. Recent motives include hatred of the middle class, colleges, persons from out of state, persons not of the same church, and those having envied properties, including even charities. The Plaintiff was advised on arrival that he was walking into the situation of local pariah Mr. Mattar, who sought to reorganize the college in the 1980s, and was often accused of having connections.

4. These village tribalists and other opportunists, such as developers seeking the school property, organized informally but militantly against the school. The Plaintiff was subjected to years of violence. The attacks included over 1500 rounds of gunfire at the school; three armed gang attacks; several murder attempts; bomb threats; three arson attempts; destruction of three school vehicles; ransacking of building interiors; dozens of break-ins with theft and vandalism; constant extreme slanders throughout the town; false reports to town, state, and federal officials; crank calls; and years of extreme noise harassment by racing of unmuffled 112dBA noise level ATVs

on the adjacent nature trail, all to prevent the opening and operation of the school. Exhibit 40 shows major incidents of crime at the school, and the nearby Lamb residences and church.

5. Defendant Lamb has admitted one or both armed assaults against the Plaintiff in which two or more minors were expelled from the Springvale school property. About 9/21/2003 the Plaintiff was attacked while working outdoors at the Springvale property by two early teenagers throwing rocks at him. The attackers fled but returned minutes later on bicycles, passing through an intervening yard near the residence of defendant Lamb, discussing their plan of attack: "If I get him, I'll drop down, and then you drop down." The plaintiff surprised them, seized their bicycles, and expelled them from the property. Their father arrived minutes later to demand the bicycles, but refused to identify himself, and was expelled from the property. He called the Sanford police, who in other incidents had protected gangs attacking the school, who refused to identify the attackers and even sought to arrest the Plaintiff for defending his life on his own property, but were unable to get permission to do so.

6. About March 7, 2004 a man threw stones at the Plaintiff's car from a home in Springvale. The next day the Plaintiff received a call from a man who claimed that he had thrown the stones, that his sons were the ones who had thrown stones at the Plaintiff 9/21/2003, and that he had himself had vandalized the school property. He laughed about the damage and asked for a "truce."

7. Another incident during this period involved a midnight attack by a gang of three men ages 18-21 armed with clubs, who were detected by beams at the school and expelled by the Plaintiff, armed only with pepper spray and a searchlight. The same gang had destroyed three vehicles of the school in earlier incidents (exhibit 40).

8. Defendant Lamb stated in his letter to the selectmen of defendant town (exhibit 120) that it was his sons who were expelled and "scared", falsely claiming that they were "kids." In fact there are only two incidents in which two or more minors were expelled from the school property. His son Carl is now about age 34, lives nearby (exhibit 40), was about 18 at that time. Unless Lamb has younger sons, his sons staged the midnight gang attack armed with clubs, and the destruction three vehicles of the school. If Lamb has younger children, he is the likely the man who admitted vandalizing the campus, throwing stones at the Plaintiff, and sending his sons to throw stones at the Plaintiff. There are no other incidents of multiple minors being expelled from the school. The statement of Lamb is an extreme libel, and an admission of armed assault upon the plaintiff.

9. The town of Sanford was controlled by low-end demagogues seeking the vote of the ignorant, and itself blocked any police action in the hundreds of crime instances, permitted the racing of unmuffled ATVs on its adjacent "nature trail," refused to enact an ordinary noise ordinance, and threatened to seize a right of way across the school campus to a wetland area. Despite many years of prosecution of the town of Sanford, the school could not be opened due to these criminal acts.

10. This related organized crime activity is recorded in the Plaintiff's 2015 novel *The National Memorial* available on Amazon. About 3600 orphans have lost their childhoods and opportunities in life as the direct result of these organized criminal activities of the town of Sanford, and this number increases at about 200 orphans every year. Local media refused to report these crimes.

11. The subject property in Waterboro includes a small island at the south end with an old, simple one-room camp, which Plaintiff had renovated for use in building the home. In 2002, when litigation against the town of Sanford reached the federal appeal level, and attacks against the Plaintiff at the Springvale property were at extreme levels, the subject property also became the target of criminals of the ATV gangs attacking the school in Springvale, led there by an ATV mechanic in Waterboro. Numerous criminals were led to the Waterboro property of the Plaintiff, harassed and threw rocks from shore at the Plaintiff there, and in multiple attacks smashed holes in the door of the camp, through the floor, and through the roof to steal tools and materials, and made false reports to codes official Berry of defendant town to interfere with its renovation. Two of the attackers, Norman Ledoux and Chris Durant, were eventually identified by the Plaintiff and prosecuted in this Superior Court in 2004 (CV-04-180), wherein codes Official Berry testified as to perjuries by Ledoux and Durant, but without effect.

**Permitting and Construction Under the Original Permits 2005-2009**

12. Plaintiff had the building site surveyed in greater detail, designed the home, and submitted plans to the Saco River Corridor Commission (SRCC). The triangular site of areas more than 100 feet from shore (exhibit 2) slopes steeply down to a flat area just beyond the site. Initial plans requested a shoreline setback variance to build with an ordinary foundation on the flat area, but this was denied. Several redesigns of the home and over a year of labor were required to plan for the sloping site, by separating two of the three bedrooms into detached guesthouses at different elevations. The SRCC permit 15-432 was granted in 2004, and renewed through 2018.

13. Plaintiff was required to spend many months in regulatory compliance efforts, hiring of surveyors, and attending many meetings of this commission far from the home of the Plaintiff. All of this investment was made with the assurance of statutes and constitutional rights that permission to build the home could not be lawfully denied, as "reasonable investment-backed expectation of value." Such expenses (MoL 3) are part of the improvement value of the property.

14. Plaintiff applied in early 2005 for a building permit for the home. Codes official Berry noted on 2/08/05 that "your drawings should be sufficient" and on 7/06/05 was sent drawings of the pier columns and steel frame (exhibit 9). The building permit GP-15 was granted 9/20/05 (exhibit 50). Emails with the codes official are shown in exhibits 100 (7pages).

15. During 2005, tools and boats were acquired, and the Plaintiff built heavy docks on the island and the shore landing, and a modular shed. The Plaintiff designed, built, and successfully tested the first amphibious trailer since WWII, to carry materials directly to the shore, to be motored across the lake and winched onto the island, and up a steep hill to the building site.

16. CEO Berry informed the Plaintiff that the town had no boat, and despite his offer of boat use, instructed him to send photos in lieu of inspections, and send plan changes for verbal approval.

17. During 2006, the amphibious trailer was used to carry the shed modules to the island, which were winched uphill and assembled, and the tools and supplies carried there and stored. Several large oak trees were cleared from the building area and made into beams using chainsaws. The site was staked. A small excavator was purchased, and a barge built to move it to the island, and it was tested to dig foundation pier holes, but was found unable to operate on steep soft forest soil.

18. Construction of the lower piers was begun in June 2006. Hand excavation required large holes and building caisson walls to retain large stones. The lower soil was highly compacted sand and gravel, of excellent load-bearing capacity, and excellent water permeability for septic systems.

19. In January 2007 CEO Berry wrote that a new permit was needed. When contacted by the Plaintiff, she stated that she would renew the permit herself. The Plaintiff then sent to CEO Berry a drawing of pier design changes, and received verbal approval. The design change was to make the piers 16"x16" filled concrete blocks with the same four rebar reinforcements as the prior 10" diameter concrete piers, so as to eliminate cross-bracing between the piers. The Plaintiff noted that the completed guesthouse foundation "should be ready for inspection by next Fall" (2008).

21

20. In early 2008, Plaintiff emailed the CEO with project status and photos in lieu of inspection.

21. During 2008, the Plaintiff constructed the upper piers of the guesthouse.

22. During 2009, the Plaintiff laboriously moved steel beams to the island and winched them up the steep hill to the site using a specially built winch rig that could be lashed to successive trees. A manual hoist arrangement was built and used to hoist the beams and set them on the piers.

23. Although the Plaintiff was unaware of any permit expiration under the informal renewal process, the renewed permit would have expired under present rules on 9/16/09. The Plaintiff was by then engaged in full time engineering work in Massachusetts, and suffered a thrombosis at the end of 2009 that precluded further commuting there, as well as the loss of employment due to the recession. Therefore no further work was done at the island site after 2009.

24. Attacks by ATV gangs upon the small island cabin at the subject property continued during this period, including the smashing of holes through the front door, sawing through the floor, smashing a hole down through the roof, and numerous attempts to destroy heavy window covers.

**Obstruction of Building Permit to Complete the Original Structure 2014-2018**

25. In 2011 codes officer Berry was reassigned, and the defendant town apparently had no codes officer for a period of at least several months during the recession.

26. In February 2012 the Plaintiff wrote to Ms. Berry to send more drawings and photos, in preparation to resume construction in 2012. He received a reply 4/13/12 from a new codes officer Mr. Mitchell, noting that the permit had expired, requesting the Plaintiff to contact him.

27. About 4/17/12 the Plaintiff went to the town offices and met with CEO Mitchell, reported progress and gave him copies of all updated drawings. He had no objection to the changes and stated that he was still getting settled in his new position, so work should proceed temporarily.

28. The Plaintiff wrote to the codes officer on 8/7/12 reporting the minor welding ("steel installation") done at the site, the only work since 2009. Mr. Mitchell wrote on 8/22/12 that the permit had expired, that a new permit was needed, and enclosed a new permit application. No further work was done at the site after this notice.

29. In February 2014 defendant Lamb became manager of defendant town of Waterboro, to whom the codes official reports. Mr. Lamb has admitted collusion with those in the village of Springvale who for many years violently opposed the efforts of the Plaintiff to establish a college

preparatory school there, and is an activist of the nearby Springvale Baptist Church opposing the Plaintiff and his charitable non-sectarian school.

30. The Plaintiff sought renewal of his building permit in early 2014 and was refused in a hostile manner. Defendant Lamb had traced the Plaintiff to Waterboro, likely informed by the ATV gangs there and in Springvale, still attacking the property.

31. In December 2014, Glen Charette and his assistant Ms. Bellman, also of Springvale, were hired by defendant Lamb as the codes official of defendant town. The codes official acted very slowly, and at last demanded and was provided with full size plans and drawings requiring months of effort, wasting the construction season. Charette later revealed that his plan was to obstruct the approved project, by denying the permit and influencing the SRCC to deny renewal of its permit.

32. In early 2016 the Plaintiff submitted a new building permit application with existing plans. Late that summer on July 24, 2016 codes officer Charette wrote the Plaintiff (exhibit 101) demanding a new (third) site survey, and a new (second) septic system design.

33. The Plaintiff was forced to waste two more building seasons arranging and waiting for the new survey and septic system designs, and printing plans in new formats. On 8/16/16 the Plaintiff submitted new printed plans, and at about that time submitted the new septic system design.

34. On 8/24/16 codes official Charette wrote demanding a new engineering design, and only one structure on the lot, despite the earlier building permit and SRCC approvals. The codes permit three homes on the subject property, and no limit to the number of structures per home. Plainly the purpose of Charette was abuse of public office to obstruct the process and injure the Plaintiff.

35. On 9/24/16 the Plaintiff submitted the new survey as built, showing a small beam extent over the site line, about 8" to 16", not violating the 100 ft setback due to the actual shoreline contour. Even where the 100 ft rule is violated, such variations are ignored as "de minimus" variations.

36. In late 2016 the Plaintiff observed several small cracks in two of the four guesthouse piers, due to weathering during the period of delays. The cracks worsened during the following years. Because no cracks occurred during the prior eight years, these may be caused by vandalism.

37. In March 2017 the Plaintiff completed extensive communications with six structural engineers, and communicated the results to the codes official, that new engineering for existing work is cost prohibitive and would have little benefit, suggesting that the Plaintiff and the town

23

agree to one of the workable alternatives, saying that "I will be glad to do anything that makes sense anyway."

38. On 3/31/17 the codes official wrote to the Plaintiff, refusing all cooperation, and further claiming ex post facto zoning violations (exhibits 101, 8 pages), establishing his intent to abuse public office, in conspiracy with defendant Lamb, to destroy the value of the subject property.

39. On 5/24/17 the Plaintiff wrote a conciliatory letter to the codes official (exhibit 101), explaining the issues of vested rights and estoppel, noting the zoning issues, and suggesting a compromise decision: "the structure built so far was permitted, and if there was a better way, I should have been told before it was built…the heavy pier structure so far was… just as much work to do differently. … So we should cooperate in finding the easiest way to make the existing structure acceptable. An arbitrator would suggest… that the town pay for the mistake."

40. The codes official refused to cooperate, refused to consider several carefully designed improvements, and wasted the remainder of another building season raising false objections, refusing to consider the issues of equity and law, and claiming that nothing could be done.

41. Plaintiff wrote to the selectmen of Waterboro 9/20/2017, advising that the town was not within its rights to deny completion of the project, had delayed the project for four construction seasons, and that Mr. Lamb should not administer any process involving the Plaintiff, because he was known to have expressed hatred of the Plaintiff in Springvale. Defendant Lamb then made outrageous slanders against the Plaintiff in a letter to the selectmen (9/20/2017 exhibit 120) that the Plaintiff had "scared the dickens out of" his "little kids" at the Springvale school campus. In fact, defendant Lamb has two sons, now about age 34, who would have been about age 18 in 2003. See facts 5-8 above for details on the midnight gang attack and the stone-throwing attacks on the Plaintiff, one of which is admitted by this statement of defendant Lamb.

42. Defendant Lamb in 2017 personally took codes official Charette to the subject site to photograph the cracks caused in the piers by his delays (exhibit 45), and stole boundary markers from the site. The first cracks were observed by the Plaintiff in 2016, and worsened in 2017-18.

43. The Plaintiff studied the town ordinances, found that the ZBA was anomalously designated to hear regulatory issues unrelated to zoning, and appealed the permit decision to the ZBA. A meeting to decide the issue was schedule for 1/5/2018 in Waterboro.

44. The plaintiff traveled over 56 hours over four days by car round trip from Florida to attend the ZBA meeting, as he had informed their secretary, and only after his arrival was told that the

ZBA members, who live within 15 minutes of the meeting, had cancelled the meeting and would not reschedule before the Plaintiff had to return south through blizzards. This outrageous conduct shows that the ZBA had been induced to extreme prejudice by the slanders of defendant Lamb.

45. The ZBA set up another meeting on 5/21/18. Although the only issue was the building permit, and no land use issues were or could have been the subject, the ZBA advertised and solicited negative public commentary including carefully prepared written statements from abuttors, claiming that any use of the subject property somehow violated their rights and precluded use of the subject property, rather precluding equivalent use of their own. All of the statements were based upon lies and immaterial concerns that somehow a new home must violate septic system or other codes already fully met, or pose unique noise problems.

46. Every conspirator was allowed to take the floor and denounce the project on no grounds at all beyond concerns just as applicable to themselves as neighbors. Although not one issue raised by the co-conspirators was under consideration by the ZBA, no member of the ZBA interrupted or ended these dishonest and immaterial testimonials. Clearly the ZBA intent was prevention of the lawful and already permitted construction at the site, and the unlawful and unconstitutional taking of its present and future value from the Plaintiff.

47. At the ZBA meeting, photos were projected showing the town manager defendant Lamb at the site personally showing the codes official cracks in the piers caused by the town's delays of the permit process (exhibit 45). The ZBA simply pretended to have no authority to review decisions of the codes official, which is in fact its only purpose, and the only purpose of the meeting, and committed the town to unlawful acts despite good legal advice.

48. The codes official of defendant town further admitted this intention at the meeting in stating that he had contacted the SRCC and colluded to gain its agreement that there would be no further renewals of the SRCC permit. The purpose of the ZBA, defendant Lamb, and the codes official was clearly to unlawfully obstruct building at the site by abuse of office based upon private prejudices and libels, and to destroy the value of the property to the Plaintiff.

49. If the ZBA had any lawful intent in its action, it would not have cancelled its meeting after forcing the Plaintiff to travel long distances under storm conditions; it would not have contacted the SRCC to seek denial of that permit as well; it would not have solicited and prepared statements regarding zoning issues not before the ZBA, nor permitted such persons to complain at length about issues equally applicable to their own residential uses; it would have recognized

25

the error of the town in denying renewal of the permit under the process set by the town, and the error of the town in approving plans that it would later call unsafe; and it would have sought a reasonable compromise to ensure safety, or would have offered to pay the cost of its errors. Instead the ZBA proved that all of its actions were made with unlawful intent to injure the Plaintiff in every way that it could, and to violate the state and federal laws and constitutions.

50. At its meeting the ZBA denied the variance required by its codes official (exhibit 121), establishing public taking of the extensive investments of the Plaintiff in the subject property. The failure of defendant to award damages to Plaintiff concurrent with the act of taking is in violation of his right to just compensation guaranteed by the Maine Constitution and the U.S. Constitution, Amendment V and XIV, and of the Civil Rights Act 42 USC §§1983-1988.

51. The ZBA decision (exhibit 121) affirmed the demand of the codes official that the existing construction be re-engineered, which prohibits its use as built, or with any simple modification:

> Based upon the above findings of fact and conclusions, the Zoning Board of Appeals votes to affirm the decision of the Codes Enforcement Officer (1) to require an engineer certification for the existing piers, and (2) that the original permit with one extension has expired.

This decision is an admission by the defendant town that it deceived and entrapped the Plaintiff to build a foundation that it would not approve. Because subsequent consultation of engineers by the Plaintiff showed that modification of the piers for certification would require as much effort and expense as their laborious replacement, and because the Plaintiff is not physically able to do the work himself, this decision demands costly contracted replacement of all existing construction.

52. The ZBA claim of having no authority to review the decisions of the codes official, or to agree to a departure from the building codes accepted by ordinance so as to approve a compromise modification of existing construction, is plainly false, and is an admission of fraud, denial of due process, and theft of plaintiff costs of ZBA process with intent to deny review.

53. The defendants have by these acts created an adversarial relationship with town officials, which precludes reliance upon any honest future discretionary acts affecting the Plaintiff, including construction activity, thereby precluding construction at the site, and therefore deprives the Plaintiff of the developed value of the subject property as a completed and attractive island

home, probably several million dollars, as well as the use thereof, which requires compensation in cash or with equivalent developed property elsewhere, plus opportunity costs.

**Damage to the Original Structure by Delays in Permitting**

54. The piers and steel frame built on the subject property showed no damage other than minor rust between completion in 2009 and the applications of the Plaintiff in 2012, 2014, and 2016 for renewal of the building permit. To prevent damage due to water freezing in concrete, the piers were covered with double tarps lashed over the tops, which remained intact in 2018. In 2016 the Plaintiff observed a small vertical crack in one of the piers, three small cracks in 2017, and five or six small cracks in 2018 (exhibits 43-49). Had the permits been renewed in 2014, the piers would have been covered by the guesthouse, and all damage avoided. The cracking occurred entirely during the permit renewal delays.

55. The contention of the codes official of the defendant town at the ZBA meeting, that the cracks showed sufficient cause to demand a new design, is in fact an admission that the town delayed the permits and caused the damage, and must compensate the plaintiff for expenses thereby caused.

56. Because the pier top areas were covered to prevent cracks due to corrosion and water freezing, the primary causes of concrete cracking, it is probable that defendant Lamb and his criminal ATV gang associates, who directed him to the site prior to the crack observations, and committed numerous prior crimes there, deliberately caused the weathering by removing the tarps covering the pier tops. Defendant Lamb himself unlawfully removed survey markers at the site, deliberately causing serious delays and expenses. The ATV gangs had caused heavy vandalism and destructive break-ins at the site almost every year.

**Crime at Springvale School Resumes After Waterboro ZBA Meeting**

57. After the Plaintiff stated at the Waterboro ZBA meeting that the decision represented an unconstitutional taking of property, and that damages for failure to award compensation would likely exceed $250,000, he was subjected to verbal abuse. About a week later, crimes at the Springvale property resumed despite a low rate of crime from 2005-2018, indicating that the same persons were involved in these decisions.

58. At no time during the state procedure, did the Town of Waterboro, City of Sanford (where the charity school property is located), state police, or county sheriff undertake any investigation of the crimes, nor did the state judge request any investigation. The crime was state policy.

58. In early June, two men bicycled from the village and watched the Plaintiff open the school gate at Pryor-Hussey Hall to enter. A few days later, a break-in by adults occurred at Pryor-Hussey Hall, in which a wall panel was pried off and materials and supplies were stolen.

59. About June 24, car lights and reflectors were vandalized at the school.

60. On June 25, harassment resumed, by a man who passes through the school grounds just at dawn, vandalizes cars and buildings, and pounds on window panels before leaving to avoid discovery. This was a daily occurrence about 2000-2006 and had not occurred since then. It is likely that this resumption of vandalism and harassment was arranged by Mr. Lamb.

## Organized Crime of the Defendants Continues Throughout State Proceedings

61. After the state case was filed against defendant Lamb of Springvale, crime at the charity school property increased rapidly. Nine affidavits of organized crime were filed in state action. No investigation was requested by the court or pursued by any state or local agency, and the state court never mentioned or considered the extensive organized crime, establishing that this crime was condoned by the state and local officials in cooperation with the state court.

62. On 7/6/2018 the defendants received the Complaint, noting their connection with prior crime by ATV gangs at the subject property, and that of Lenox School in Springvale.

63. On 7/8/18 and 7/9/2018 ATVs brought older teenage criminals to the school property for further organized crime, who were chased back to their ATVs. Exhibits 220-224.

64. In September 2018 criminals organized by the defendants removed covers over foundation piers and steel floor beams on the subject island property. Exhibits 225-226.

65. In August - October 2018 several attacks by the defendants were made at the school property by teenagers who fled toward the house of defendant Lamb and the "church" where he organizes "youth activities." The attacks damaged buildings and severely damaged a vehicle. Exhibits 230-233. Axe damage to the entrance of Hanscom Hall prevented sale of the school property in late 2018, causing major consequent damages.

66. From July through October 2018 the Plaintiff observed several attempts to break into the well secured cabin at the subject island property. This structure had been attacked by ATV gangs 2000-2004 during litigation against the town of Sanford, now organized by the defendants.

67. In April 2019 further organized crime by the defendants at the school property in Springvale damaged fenders and smashed the windshield, trim, and bumpers of a parked car. Exhibits 240-246 attached. The school entrance fence was also damaged.

68. On January 13, 2019 the Sheriff of York County reported to the Plaintiff serious damage to the cabin at the island property. Report no. 19Y5039-0F was not available.

69. The Plaintiff traveled to the island cabin April 21, 2019, and photographed numerous attempts to smash padlocks, pry off heavy window covers, and pry off heavy sheet metal covering the cabin underside. Criminals working for the defendants had again used an axe, to make a battering ram, and smashed a hole in the exterior wall. Exhibits 250-253.

70. The Plaintiff observed and photographed further destruction of the vehicle at Lenox School on May 5, 2019 (Exhibit 261). The damage occurred between April 30 and May 10. Additional holes had been smashed through the windshield. Sanford Police made Report No. A-41673.

71. The Plaintiff further observed severe damage to three boats stored at the Lenox School campus in Springvale. All boat covers had been removed (Exhibit 261) and stolen. A boat support framework was destroyed, and concrete blocks were stacked to enter the sailboat (Exhibit 262), as had been done by an ATV gang to access Hanscom Hall months earlier. Equipment had been removed from the boats and stolen or destroyed, including the sailboat mast, spinnaker pole, and the runabout windshield and railing. The trailer tires were slashed (Exhibit 263).

72. In May 2019, covers were destroyed and holes smashed in a storage shelter for heavy equipment (Exhibit 264). Further exterior damage was done to Hanscom Hall (Exh. 265, 266).

73. In June 2019, plow truck covers were destroyed and a window smashed out with a ramrod (Exhibits 267, 268). Impact damage was done with a sledgehammer or axe to Hanscom Hall which will be very laborious and costly to repair (Exhibits 269, 270, 271). An infrared intrusion-detection beam pair was destroyed near the school entrance (Exhibits 272, 273). A video camera at Hanscom Hall was destroyed (Exhibits 274, 275).

74. In July and August 2019, further extreme damage was done to a vehicle stored at the Lenox School campus in Springvale (exhibits 300 - 302).

75. In July and August 2019, further damage was done to three boats stored at the Lenox School campus in Springvale (exhibits 305 – 307, 310 – 313, 315 – 316). The rate of crime at the school decreased sharply when the school year began in early September.

76. In October and November 2019, further destruction was done to the boats, car, a utility trailer, and another landscape tree at the entrance of the Lenox School campus in Springvale (exhibits 304, 320 – 321, and 323).

77. During winter 2020, further damage was done to docks at the subject islands, and to a small cabin and construction shed there (exhibits 400 - 412).

78. These continued felony crimes by the "youth activities" group of defendant Lamb and his "church" and of the defendant town of Waterboro constitute racketeering under state and federal law. Over one hundred exhibits of damage caused by the racketeering crime have been filed.

**Crimes of Defendant Brogan Throughout the State Proceedings**

79. Nearly every statement of defendant Brogan in the state proceedings was an act of perjury as to the facts, the law, or the course of proceedings. Even in the service of Summons Brogan lied: he had admitted service by six means: two signatures, filing of appearance, filing objection, statements therein, and failure to deny service, yet dishonestly demanded service by Sheriff, the seventh proof of service. This scam proved the extreme dishonesty of Brogan. Defendants have a right to representation, but not perjury and fraud, nor does Brogan have a right to such crime.

80. Like most state rules, the Maine rules require an Answer to the Complaint, which must fully and fairly address each claim, and assert all defenses in sufficient detail to determine whether those rise above mere allegation. Claims in the Complaint "are admitted when not denied in the responsive pleading." Brogan filed a fake Answer, failing to address any fact or claim or to present any defense, merely naming all defense categories and denying all fact and claim categories, in violation of all of the state rules. Brogan made the idiotic fraud that any Complaint statement of fact outside the Statement of Claims somehow violates the brevity of the Statement of Claims, and concealed within his fake answer a motion to dismiss without memorandum or any cognizable legal basis. These are all crooked-lawyer gambits, which should be punished.

81. Brogan's statements under oath merely denying categories of defenses without fact or argument, are perjuries. His vague claims that counts were "incomprehensible" despite their definitive clarity, are perjuries. His denial of all claims while refusing to address any claim with

fact or argument, his unargued denial of all jurisdictional statements, his blanket denials of all
Fact sections while failing to address any fact, are the most extreme possible violations of Maine
rules. But the state judge proved his political corruption, by refusing to require a valid Answer.
82. The crooked Brogan refused to answer essential interrogatory questions sent by the plaintiff,
and then sent an interrogatory far exceeding the maximum number of questions, nearly all
answered by the Complaint or immaterial, even demanding personal data to be abused. When
these were duly answered, Brogan secretly filed a letter of perjuries to the clerk, alleging that
questions were unanswered, and requesting that the *clerk* file an order of the Court to support his
perjuries, unsupported by any fact, argument, or even proof of service. Brogan then lied that he
had merely requested a hearing on a motion he never made. Yet more Brogan perjury and abuse.
83. In the record of administrative proceedings (for Count I mandatory but moot ZBA appeal),
the town admitted to the Plaintiff that Brogan had extensively altered the file to create a fake
ZBA record to deceive the court, deleting the meeting minutes with all Plaintiff statements, and
email with neighbors soliciting objections without legal basis or admissibility. Brogan substituted
pier damage photos made during trespasses in which defendants removed tarps and left piers
exposed to the weather. The Brogan ZBA "record" is another long list of extreme perjuries.
84. Brogan then filed a vacuous motion to strike objections to his perjuries, failing to find a
single instance of "redundant, immaterial, impertinent, or scandalous material" nor "frivolous"
nor "baseless allegations" nor a very long list of other completely fictitious objections, any
category of perjury he could think of, claiming only that pursuing his perjuries would waste "time
and resources," yet another perjury. Brogan's fake "Answer" and all his motions were extremely
dishonest, unsupported, and any honest judge would have stricken them or ordered amendments.
85. In yet another fraudulent attempt to disrupt proceedings, Brogan then filed an objection to the
plaintiff filing the ZBA "record" he prepared himself, another long list of wild perjuries, claiming
that he had not been served the document he prepared (it was sent to him by certified mail), that
he was not consulted as to its contents (!), and that his own record did not comply with the rules.
To these insane and endless perjuries and non-arguments he added an absurd motion to dismiss.
86. With no cognizable argument nor material fact presented by Brogan, the plaintiff moved for
summary judgment, to cut short the scams and organized crime sprees of the defendants against
his charity school property and the subject property. Brogan responded with another list of
perjuries, claiming absurdly that paragraphs were not numbered (they were), that it may not

reference separate memoranda of law (false), that a lawyer had to be notified of the rules he was himself citing, etc. But Brogan had failed to make any cognizable Answer, thereby admitting all facts, and had failed to plausibly oppose any facts of the Motion for Summary Judgment.

87. At hearing, Brogan persuaded the corrupt state judge of another remarkably foolish plan, to pretend that the mandatory but now moot administrative appeal of the ZBA decision (Count I Rule 80B), would if affirmed somehow preclude the primary claims of property taking. The two of them exchanged smirks at the hearing: this might be sufficient to fool the population and get the judge more *quid pro quo* offered to savages of the tribe of state employees. It was plain to all that no rational consideration of law was to be made, and it was not. It made no difference that RICO prosecution was promised to all who colluded in the defendants' scheme, for all knew the ins and outs of the Inns of Court, the grifter's back-channel to higher judges.

88. In his second concealed motion in violation of essential rules (3/5/2019 Opposition), grifter Brogan made ten more perjuries to claim falsely that the pro se party was violating rules. Brogan simply lied endlessly that the extensive record of defendants' organized crime throughout the state action left it "unsubstantiated" and mere "libel" and that notices of RICO prosecution constituted "threats"; that defendant photos of themselves having removed foundation pier covers do not show their involvement, which "if true would be the subject of criminal investigation" showing his awareness of the suppression thereof; that plaintiff filings violated unspecified rules and court requests; that plaintiff oaths were "craftily worded" despite the truth of all plaintiff statements, while statements of his endless perjuries violate "decency." No argument, no fact, nothing from Brogan but a street punk's perjuries, scams, and fraud.

89. In his appellee brief (for the mandatory but moot ZBA administrative appeal), Brogan again relied entirely upon perjuries of fact and fraud as to the law. In fact, the Plaintiff sought to confer with Brogan on the ZBA record composed by Brogan and received no response; the record had been correctly filed by the Plaintiff and Brogan's denial thereof was perjury; all exhibits were provided to Brogan, whose denial thereof was perjury; Brogan's claim that the Plaintiff Brief violated rules was perjury: his claim of "several pages" of single-spaced material could only refer to quotations permissibly so formatted. Brogan's appellee argument was based on the fraudulent and absurd claim that town ordinances somehow supercede state law and state and federal constitutions. Again Brogan produced nothing at all but perjuries as to facts, and frauds as to law.

90. Brogan filed on 1/30/20 an absurd motion for judgment on the pleadings consisting of frauds. Brogan merely asserted repeatedly without argument that the facts were not "sufficient to withstand a motion to dismiss" knowing that a court may so dismiss only when

> …no construction of the factual allegations will support the cause of action. *Marshall Cty. Bd. of Educ. v. Marshall Cty. Gas Dist.* [40]

The Complaint met all requirements in its exemplary Statement of Claims, referenced far more than sufficient fact in its Statement of Facts, and the provided evidence of property taking was all *admitted documentary evidence*. Brogan claimed fraudulently that the principal counts of property taking and abuse of public office were magically "subsumed" into the moot preliminary administrative appeal, but offered only an immaterial citation. This was the fraudulent gambit agreed with a smirk by the corrupt local judge at hearing, which he then approved, ignoring the exemplary second motion for summary judgment with full fact, argument, and admitted evidence. These are plainly the acts of political gangsters, in violation and subversion of law and constitutional rights, both state and federal. These were acts of racketeering in public office.

91. Brogan has thoroughly proven himself an worthless scammer with a lifelong practice of perjury, no more than a street punk committing crime for profit via primitive gangsterism. He recruited a similarly corrupted state judge with promises of gang benefits, and both acted with intent to subvert the Constitution and laws of Maine and of the United States. Brogan is accountable for his countless perjuries and frauds as violations of constitutional rights, and will be properly prosecuted for collusion in racketeering crime with the other defendants.

**State Courts Evaded State Law with Perjuries as to the Facts and the Law**

92. Although the state law issues were presented with definitive Memoranda of Law and hundreds of exhibits uncontested by the defendants, the state court committed numerous perjuries as to the facts, law, and course of proceedings to give a break to lawless officials. It completely ignored all principal issues and pretended to be confused about basic concepts, denied without basis that any law could be applied, and invented claim preclusions without basis in law.

93. The state court denied a fully-justified motion for Summary judgment 1/21/20 and made a completely unsupported judgment on the pleadings 5/26/20 consisting of deliberate "errors" of law, all of them frauds supplied by defendant Brogan (detailed in Memorandum of Law 4):

> 1. Failure to Apply the Determinative Law of Vested Rights and Estoppel

    2. False Denial of Entrapment by Town-Required Informal Process
    3. Erroneous Denial of Summary Judgment and Dismissal of Count I
    4. False Pretense of Claim Exclusion by Preliminary Administrative Appeal
    5. False Statements of Law to Ignore the MCRA (civil rights) and MTCA (tort claims)
    6. Unlawful Dismissal of Libels and Abuses of Office by Defendant Lamb
    7. False Statements of Law on Statute Violations
    8. False Statements of Fact

The state court's perjuries of fact and law, ignoring of claims, and extreme distortions of process, even as defendant crimes continued without investigation, were abuses of office in collusion with the defendants, with intent to deny constitutional rights.

94. Upon appeal, the state court of last resort corruptly evaded the issues by claiming falsely that the Plaintiff lacked standing despite the very clear statement thereof (see Parties above), but affirmed the lower court's errors without argument despite that, a clear admission of corruption.

**Conclusion**

95. As argued in Memorandum of Law 1 section *Argument of Vested Rights of Construction*, the facts establish that in 2004-2009 the Plaintiff sought and obtained all necessary permits for construction of a home on the subject property, and commenced construction in accordance therewith. The necessary tools and transport were assembled and the shed and foundation were laboriously completed. The Plaintiff complied with all methods of approval of design changes and permit renewal established by the codes official of the town, which did not have a boat and would not use his boats to access the island site. The Plaintiff thereby clearly established the vested right to complete construction of the home as permitted, regardless of any ordinances requiring renewal of permits, and regardless of permit requirement changes enacted *ex post facto*.

96. The subject property had been attacked several times in 2000-2004 when the school campus of the Plaintiff in Springvale was under frequent violent and armed attacks by ATV gangs and others; the attackers were members of ATV gangs in Waterboro and Springvale, who sought to interfere with the building permit process. Defendant Lamb was associated with these incidents. The town later hired defendant Lamb as its town manager, known to harbor hatred of the Plaintiff and his charity work. Lamb committed perjury against the Plaintiff to officers of defendant town, and hired a codes official also from Springvale to obstruct the work of the Plaintiff. The Plaintiff began in 2012 to renew the permit after the recession and was delayed from 2014 to 2018 by

demands of the defendant town to make further surveys and redesigns despite prior approvals. During that period, weathering cracks appeared in the piers at the site, which had not occurred in the eight years since their construction, caused by the delays of the defendants.

97. Lamb's codes official made numerous unlawful demands for redesign despite prior design approval, knowing that this could not be done without destruction of the extensive investment of the Plaintiff, a clear case of malicious entrapment and abuse of office to destroy property value. Defendant Lamb has acted in abuse of public office and in collusion with officials of defendant town to deny to the Plaintiff the improved value of the subject property, and has committed perjury and libel in statements to officials of the defendant town and other regulatory entities. The violent crimes of the tribalists of Springvale, led by the tyrant defendant Lamb, continued throughout the state proceedings as documented by nine affidavits of continuing organized crime with many exhibits, destroying another car, two boats, two trailers, and causing damage by axes and clubs to building exteriors at the school, all ignored by the corrupt state court.

98. Defendant Brogan made hundreds of extreme perjuries during the state proceedings as to the facts, the law, and the course of proceedings, made no cognizable defense, recruited the similarly corrupt state judge, and acted with intent to subvert the Constitution and laws of Maine and of the United States, in collusion with the organized crime enterprise of the defendants.

99. These facts establish a pattern of willful abuse of office by officials of defendant town, and crime and tort by defendants Lamb and Brogan. The defendants are *principals* in the first degree by commission, solicitation, protection, and ratification, and are accessories before and after the fact, in these torts and abuses of office committed against the Plaintiff, with the intent and effect of destroying the value of property of the Plaintiff and violating his Constitutional rights. The defendants persisted in unlawful and discriminatory acts with full knowledge of the rights violated and the injury done, by choice among alternatives, and under color of state law. Every such act of the defendants has been without the consent, against the will, and in violation of rights of the plaintiff, has injured him in the use and enjoyment and value of his property, investment in its improvement, and realization of its value as improved.

Therefore the defendants have denied the rights of the Plaintiff guaranteed by the Constitution and laws of the state of Maine and of the United States, causing major loss of property value, and have colluded in organized crime against the Plaintiff.

**Demand for Relief**

1. The Plaintiff respectfully petitions this Court for compensation of damages by municipal taking of his property interests and destruction of his substantial effort and investment to develop the subject property, and consequent major damages to the developed value of the subject property, and to his future income. See *Memorandum of Law 3*, section Damages. An order shall be provided with appropriate detail.

2. Defendant town waives immunity beyond its insurance coverage by not seeking such coverage.

3. The defendants have proven over several years their intent to prevent or burden construction of the home or burden its use, and should be ordered to compensate the full value of the completed home on a private island, less the remaining cost of construction as planned by the Plaintiff. This is the value that the defendants intend to take from the Plaintiff, by their present and future actions, which must be compensated.

4. The Court cannot readily resolve the issues of town officials refusing cooperation, seeking to block SRCC approval, and inducing crimes against the Plaintiff, so that the defendants will certainly continue to prevent or burden construction of the home and burden its use, causing future litigation. The Court could in principle order the town to compensate only denial of use for seven years, re-engineering of plans, contracted removal and building of the entire foundation, and materials transport, as the Plaintiff can no longer do that himself due to these delays. But then the Plaintiff would have no protection against collusion by the town to obstruct the SRCC permit, building process, renewals, and would have to complete the construction himself during his retirement, despite the loss of seven years of use, with the almost certain loss of the entire value of the completed home and its use by the Plaintiff.

5. The Plaintiff respectfully petitions this Court for full compensation for his damages by deliberate municipal taking of the principal use and enjoyment of his property, destruction of his substantial effort and investment to develop the subject property, and his future income by reversion and sale thereof, or by his pension agreement with the school, and his labors and costs of regulatory process and of prosecution. The loss of value of the property is the difference of present land value and the value as improved with an attractive home upon a private island.

***Estimate of Just Compensation For Taking Of Private Property***

6. The Fair Market Value as improved with an attractive home upon a private island is between $2 million and $3 million depending upon market conditions. The loss of value of the subject property due to acts of the defendants, is the FMV less the remaining cost of owner-completion. The middle of this range is used below to estimate damages due to acts of the defendants.

7. The remaining cost of completion of construction by the approved plans, on the schedule feasible prior to delays by the defendants, is the cost of materials, tools and supplies. The Plaintiff provided all labor and construction management, usually about two-thirds of construction costs. The 1200 sq. ft. home would have cost roughly $120 to 150 per square foot to build at this location, of which about one-third ($40,000 to $50,000) would be the materials, tools and supplies cost to the Plaintiff, less the cost of the construction done, about $10,000. The cost of completion without these actions of the defendants was therefore about $30,000 to $40,000. The middle of this range is used below.

8. An initial estimate of total property loss of Plaintiff due to public taking is based upon the midrange figure of the above estimate of Fair Market Value and completion cost:

| | |
|---|---|
| $2,000,000 | Fair Market Value of the property as a new home on a private lake island |
| $    35,000 | Cost of completion of home by Plaintiff without adverse acts by defendants |
| **$1,965,000** | **Property value lost due to acts of the defendants** |

This figure is used as the initial demand for compensation. Because the cost of completion is a small fraction of the market value, the actual value lost may be found more accurately, and is likely to lie between $2 million and $3 million depending upon market conditions.

**OATH**

I do solemnly swear that all statements of fact in the foregoing document are true and correct to the best of my knowledge and belief, and that a true copy thereof has been served this day by deposit of certified First Class U.S. mail addressed to each defendant.

Date: _____

_____
John S. Barth, Plaintiff, pro se

**Certificate**

The above-named John S. Barth appeared before me and stated that the foregoing document is his free act and deed.

Before me

_____
Notary Public

Rodrigo G Posada

Sarasota County, State of Florida

RODRIGO G. POSADA
Notary Public, State of Florida
Commission# GG 927825
My comm. expires Oct. 30, 2023